**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---

EDDIE WILSON,

        Plaintiff,

     v.

Chicago Police Officer JOSEPH VECCHIO,
Chicago Police Sergeant ERICK SENG, and
CITY OF CHICAGO, a Municipal
Corporation,

        Defendants.

Case No. 24-cv-12371

*Jury Trial Demanded.*

---

**FIRST AMENDED COMPLAINT**

---

NOW COMES Plaintiff, EDDIE WILSON, by and through his attorney, LAW OFFICE OF JORDAN MARSH LLC, complaining of the Defendants, Chicago Police Officer JOSEPH VECCHIO, Chicago Police Sergeant ERICK SENG, and CITY OF CHICAGO, and states the following:

**JURISDICTION AND VENUE**

1. This action arises under the Constitution of the United States, particularly the Fourth and Fourteenth Amendments to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, §§ 1983 and 1988, and under the laws of the State of Illinois.

1

2.  The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, §§ 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

3.  This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the federal claims. Venue is proper in the United States District Court for the Northern District of Illinois under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

## PARTIES

4.  At all times relevant herein, Plaintiff EDDIE WILSON (hereinafter "Eddie") was a resident of Chicago, Cook County, and resided in the Northern District of Illinois.

5.  Defendants VECCHIO and SENG ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

6.  At all times relevant, Defendant SENG was VECCHIO'S sergeant and supervisor.

7.  Defendant CITY OF CHICAGO is a government entity operating within the State of Illinois. The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment. At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants VECCHIO and SENG.

## FACTS

8. This matter arises from a pretextual traffic stop by Defendants Vecchio and Seng ("Defendant Officers") of an African-American motorist named Eddie Wilson ("Eddie").

9. The stop was allegedly based on Eddie's alleged failure to park within 12 inches of the curb, which should have resulted in nothing more than a parking ticket.

10. Defendant Officers approached Eddie because he was a Black motorist and they wanted to search his car for contraband. So they came up with an excuse to engage him, they made up an excuse to order him to exit the vehicle, detain him in handcuffs, and search his vehicle in hopes of finding a weapon or narcotics.

11. Along the way, Vecchio – as he has in at least one other case – took the opportunity to insult and belittle Eddie.

12. After the stop, Vecchio – as he has in at least one other case – authored an Investigative Stop Report ("ISR") riddled with false statements.

13. Defendant Officers' conduct in this case was committed as a result of and in conformance with the Chicago Police Department's yearslong pattern and practice of pretextual traffic stops and illegal searches targeting Black and Hispanic motorists, the vast majority of which yield negative results and no charges or even tickets.

14. The only tangible results of this practice are an epic waste of time, resources, and taxpayer dollars and the continued deterioration of the already-fractured relationship between the Chicago Police Department and the citizens it is sworn to serve and protect.

**The Incident**

15. On October 21, 2024, at approximately 4:25 p.m., Eddie was in his vehicle, which was stopped in a standing zone at or near 231 East Ontario Street in Chicago, Illinois.

16. Eddie had just returned to his car from a nearby restaurant.

17. Defendant officers drove past Eddie, saw that he was Black, made a U-Turn, then pulled their squad car in front of Eddie's car rather than behind it as officers are trained to do for their own safety.

18. Defendant Vecchio approached Eddie on the driver's side, despite the presence of a fence and tall bushes at the curb line that would have trapped Vecchio if Eddie were to engage in threatening or aggressive conduct against Vecchio.

19. Eddie lowered his window when Vecchio approached.

20. Vecchio informed Eddie that he was "parked a little bit further than 12 inches from the curb", and that he was obstructing traffic.

21. In fact, Eddie's car was not obstructing traffic.

22. Seng's squad car, on the other hand, was stopped in the middle of the traffic lane and completely obstructed the moving lane of traffic.

23. Vecchio informed Eddie that he wanted to give him a warning.

24. Despite the fact that the alleged violation was a parking violation, Vecchio requested to see Eddie's driver's license.

25. Eddie complied.

26. Vecchio told Eddie, "I got to have [Eddie's driver's license], so I could…"

27. Vecchio trailed off and did not finish explaining why he needed to see Eddie's driver's license.

28. Vecchio asked Eddie if he had insurance.

29. Eddie explained that the car belonged to his girlfriend and that he had to call her.

30. Vecchio directed Eddie to roll down his passenger window so his partner could speak with him, "and then I'm going to run your I.D. so I can get you out of here."

31. Vecchio went to his squad car to run Eddie's driver's license, which came back clear with no warrants or other issues.

32. When Vecchio returned to Eddie's vehicle, he informed Eddie the plates were expired.

33. "It's not my car, bro," said Eddie.

34. "I know, but you're driving it, bro", said Vecchio.

35. Vecchio said to no one in particular, "I don't know, this guy's sparkin' up a pretty hostile attitude with me."

36. In fact, Eddie was behaving calmly and was not acting in a hostile manner.

37. Vecchio began lecturing Eddie on how to talk to people.

38. "You gotta figure out how to talk to people, man," Vecchio said. "It's not right."

39. Vecchio continued the lecture: "I'm not like your brother or like your friend, you know what I mean?"

40. Vecchio directed Eddie to roll down his rear window.

41. Eddie complied.

42. "You got anything in the car we gotta know about, man?" Vecchio asked.

43. Eddie said, "No."

44. Vecchio asked again – "There's no weapons or anything like that, there's no weed?"

45. Eddie said "No."

46. Vecchio continued to ask: "If I check I'm not going to find anything?"

47. Eddie informed Vecchio he did not consent to any searches.

48. "I'm not asking you that, though", said Vecchio.

49. Eddie repeated he did not consent to any searches.

50. Vecchio ordered Eddie to step out of the car.

51. Eddie complied.

52. Vecchio patted down Eddie, then directed him toward Seng, who placed Eddie in handcuffs.

53. "You okay, man?", said Vecchio sarcastically when Eddie expressed frustration that he was being handcuffed.

54. "You're makin' us nervous, man", said Vecchio.

55. Eddie objected to the officers' conduct, telling them he was teaching the constitution to his students.

56. "What is the Fourth Amendment?", Vecchio asked Eddie.

57. Eddie informed Vecchio that he had violated his Fourth Amendment rights because he did not consent to any searches or seizures.

58. Vecchio began to search the interior of Eddie's vehicle.

59. "I still want you to tell me what the Fourth Amendment is, man," said Vecchio.

60. "Even spell the word 'amendment' would impress me right now," Vecchio said as he began to search Eddie's trunk.

61. After a pause, Vecchio said, "I didn't think you could."

62. Vecchio continued to search the interior of Eddie's vehicle.

63. Vecchio walked up to Eddie, who was speaking with Seng, and began to place his hand close to Eddie's groin.

64. Eddie instinctively stepped back.

65. "Relax, man. Let me pat you down," said Vecchio as he turned Eddie around.

66. In fact, Vecchio had already patted Eddie down earlier.

67. Vecchio's search of Eddie and his vehicle yielded no evidence of contraband or criminal activity.

68. Vecchio released Eddie from his handcuffs.

69. Eddie requested Vecchio's badge number and name, which Vecchio gave him.

70. "Have a good day", said Vecchio as he returned to his vehicle.

71. Defendant officers never charged Eddie with a crime or gave him a ticket.

72. The stop lasted approximately eight minutes.

### The false report

73. After the stop, Vecchio completed an investigatory stop report ("ISR").

74. In the ISR, Vecchio falsely claimed that as officers approached Eddie's car, "[Vecchio] observed the above subject/driver to make furtive motions with his right hand quickly placing an object near the center shifter area making r/o's [sic] reasonably believe that possible contraband was being concealed."

75. This never happened. Eddie made no "furtive motions". Falsely claiming that a motorist made "furtive motions" is one of the ways Vecchio and other Chicago police officers falsely justify their illegal searches of vehicles.

76. Vecchio next wrote that "as the subject exited, r/o's observed a large 'L-shaped' and heavy bulge near the front sweater pocket area and r/o conducted a protective pat down reasonably believing a possible firearm was concealed in that above area. This pat down revealed a large amount of currency (stacked up with a rubber band) creating the 'L shaped' bulge."

77. This was false. First, there was no "L-shaped bulge" in Eddie's fleece, and currency does not create an "L-shaped bulge". There is nothing "L-shaped" about a large amount of currency rubber-banded together. If anything, it would be a lower-case "l" or perhaps an "I" – nothing that would suggest a firearm.

78. Second, a stack of currency would not have the same weight or consistency as a firearm.

79. Third, neither of the officers removed the alleged item from Eddie's fleece in order to determine what it was. There is no evidence that the alleged object was currency "stacked up with a rubber band".

80. Vecchio further claimed in the ISR that Eddie "became hostile with r/o's at one point becoming verbally aggressive and at another point pulling away and swiftly turning his body away from r/o's during a protective pat down."

81. Eddie was never hostile or verbally aggressive toward the officers.

82. Eddie did not raise his voice at any time, engage in aggressive behavior, or say anything that suggested he would become aggressive.

83. At one point, Vecchio – without warning – approached the front of Eddie's groin area with his hand. Eddie instinctively backed away for a moment, prompting Vecchio to roughly turn him around to pat him down.

84. Vecchio claimed in the ISR that "r/o's could not give or explain an ISR receipt because the subject asked if he was free to leave and left to return into his vehicle quickly."

85. This was false. It was the officers who quickly returned to their vehicles without explaining what an ISR receipt was or offering to provide one to Eddie.

**Seng's awareness of prior similar misconduct by Vecchio**

86. On September 23, 2024, Seng responded to a complaint by another Black motorist named Desmen Northington, who was the victim of similar misconduct by Vecchio and other officers in the same vicinity as the incident with Eddie. (See Northington v. Tohatan, et al., 24-cv-11466.)

87. When Desmen described the actions of Vecchio and the other officers to Seng, Seng called the officers' actions "unacceptable", and suggested he would suspend the officers.

88. Seng reportedly reviewed video footage of Vecchio and other officers threatening, mocking, and belittling Desmen while unlawfully detaining him and searching his vehicle.

89. Seng called Desmen the next day and informed him that after reviewing the footage, he was embarrassed and found the officers' actions "very distasteful".

90. Seng offered to suspend Vecchio for one day and issue reprimands to the other officers.

91. When Desmen insisted on filing a complaint against the officers with the Civilian Office of Police Accountability ("COPA"), Seng's tone changed, and he suggested Desmen was looking for a payout.

92. Seng attempted to dissuade Desmen from filing a complaint with COPA.

93. Later, after he filed his complaint with COPA, Desmen was informed that Seng never suspended any of the officers.

### CPD'S LONGSTANDING PATTERN AND PRACTICE OF RACIALLY DISCRIMINATORY TRAFFIC AND INVESTIGATORY STOPS

94. Chicago police have a longstanding practice of disproportionately targeting Black and Hispanic drivers for traffic and pedestrian stops.

95. Defendant Officers stopped Eddie pursuant to a de facto policy and practice within the Chicago Police Department of disproportionately targeting Black drivers in baseless, pretextual stops as a means to search them and their vehicles, in the hopes of finding contraband or other basis to arrest and criminally charge the Black drivers or occupants of the vehicle. This includes pulling over moving vehicles, approaching stopped or parked vehicles, and stopping pedestrians.

### DOJ Report

96. In 2015, the United States Department of Justice (hereinafter "DOJ") Civil Rights Division and Special Litigation Section, as well as the United States Attorney's Office for the Northern District of Illinois, initiated an investigation of the Chicago Police Department and the then-existing Independent Police Review Authority (hereinafter "IPRA").

97. The DOJ report was released on January 13, 2017.

98. According to the January 13, 2017, DOJ report, Black Chicagoans have been disproportionately targeted for decades by the Chicago Police Department and have been subjected to disproportionately higher rates of stops, searches, arrests, charges, and uses of force than white Chicagoans.

99. The DOJ found that CPD did not adequately train or supervise its officers, noting that "CPD does not provide officers or supervisors with adequate training and does not encourage or

facilitate adequate supervision of officers in the field. These shortcomings in training and supervision result in officers who are unprepared to police lawfully and effectively; supervisors who do not mentor or support constitutional policing by officers; and a systemic inability to proactively identify areas for improvement, including Department-wide training needs and interventions for officers engaging in misconduct."

### State of Illinois Lawsuit and the 2019 Consent Decree

100.    In August 2017, the State of Illinois sued the City of Chicago, seeking to "ensure the City enacts comprehensive, lasting reform of the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA"), and the Chicago Police Board ("Police Board"). State of Illinois v. City of Chicago, Case No. 17-cv-6260, (Northern District of Illinois, August 29, 2017), Dkt. 1.

101.    In its lawsuit, the State noted that "[f]or nearly 50 years, reviews of CPD's policing practices have identified significant failures by CPD officers to act lawfully." Id. at ¶ 3.

102.    The State alleged that the City was deliberately indifferent to the repeated pattern of CPD's use of excessive force and racially discriminatory policing practices, and that External complaints, threatened and actual lawsuits, and government commissioned reports, along with the media's frequent coverage of CPD's repeated use of excessive force and racially discriminatory police action, have put the City on notice of CPD's unconstitutional conduct

103.    As a result of the State's lawsuit, the City entered into a Consent Decree, in which the City agreed to institute many reforms to bring CPD's conduct into compliance with the U.S. and Illinois constitutions and other applicable laws.  (Dkt. 703-1.)

104. The Consent Decree, which became effective March 1, 2019, was established "to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety."

105. The Decree further sought to "ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely." The Decree required changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management. (Consent Decree, Dkt. 703-1, at 8.)

106. U.S. District Judge Robert M. Dow appointed Independent Monitor Margaret M. Hickey, who leads an Independent Monitoring Team ("IMT") which would monitor and evaluate the City's compliance with the Consent Decree, and issue quarterly progress reports. (Id., Dkt. 713.)

107. The City agreed to attempt to meet all of the requirements of the Consent Decree within five years of its effective date. (Consent Decree, ¶ 714.)

108. On March 25, 2022, the Consent Decree was extended an additional three years because of "missed deadlines and lagging compliance". (Dkt. 1011.)

109. In June 2023, the IMT reported that the City had only achieved 82 percent preliminary compliance with the provisions of the Consent Decree and had only achieved full compliance of six percent of the Decree's provisions. (Dkt. 1097 at 4.)

110. Sharon Fairley, a University of Chicago Law School professor who previously served as chief administrator of the Independent Police Review Authority, told WTTW News, "Clearly, from the monitor's semi-annual reports, the department is not as far along with compliance as they could or should be at this point."[1]

111. The Illinois deputy attorney general charged with overseeing the consent decree said that the city and CPD had "resisted commonsense" proposals to fix major problems.[2]

112. On June 14, 2023, the City's former Inspector General, Joe Ferguson, filed a public comment in the Consent Decree litigation. Ferguson expressed frustration with the City's halting progress of compliance with the consent decree and called for a "hard reset" and a "fresh start" for oversight of the decree, "because Consent Decree implementation and monitoring is a faltering undertaking both in substantive accomplishment and in transparency. In the absence of a hard methodological and operational reset, I believe the Consent Decree is at high risk of failing to achieve its objectives." (Dkt. 1092 at 1.)

113. The City's failure to comply with the Consent Decree continues to this day and is embodied in the types of incidents described herein.

---

[1] Guthmann, Andrea, *Examining the Chicago Police Department's Progress on the Consent Decree Almost 5 Years Into the Process*, WTTW News, accessible at https://news.wttw.com/2023/08/28/examining-chicago-police-department-s-progress-consent-decree-almost-5-years-process.
[2] Lehman, Charles Fain, *Is the Chicago Consent Decree Working? Consent Decrees for Police Reform: The Chicago Experience*, Manhattan Institute, July 20, 2023, accessible at https://manhattan.institute/article/is-the-chicago-consent-decree-working-consent-decrees-for-police-reform-the-chicago-experience.

114.    According to the CPD Consent Decree Independent Monitoring Report 9, "the City and the CPD continued to struggle to make progress toward compliance" with impartial policing requirements in the Consent Decree.[3]

115.    As of December 31, 2023, the City and CPD had achieved preliminary compliance with eight provisions of the consent decree regarding impartial policing, secondary compliance with 12 provisions, and no compliance with nine provisions.

116.    The City and CPD had not achieved full compliance with any of the impartial policing provisions of the Consent Decree.

117.    In the 10th Independent Monitoring Report, issued on November 19, 2024, the IMT reported that "the City's and the CPD's progress toward compliance with these important [impartial policing] requirements remained largely unchanged from the previous reporting period."[4]

118.    The IMT noted that "the City and the CPD have not reached any level of compliance with five paragraphs in the Impartial Policing section, which is concerning".[5]

**OIG Report**

119.    According to a March 1, 2022, Office of Inspector General ("OIG") Report on Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force, "quantitative evidence from investigatory stop and traffic stop data shows an overwhelming disparity in the rates at which Black and non-Black people were stopped by the police. The overrepresentation of Black

---

[3] Chicago Police Department Consent Decree, Independent Monitoring Report 9, July 1, 2023 – December 31, 2023, p. 24, *available at* https://tinyurl.com/3u67ja6s.

[4] Chicago Police Department Consent Decree, Independent Monitoring Report 10, January 1, 2024 - June 30, 2024, p. 24, available at https://tinyurl.com/64fmhxun.

[5] Id. at p. 26.

people among those stopped by the police was consistent across traffic stops and investigatory stops, and it was persistent across every CPD District, notwithstanding differences in District crime rates and the demographic composition of District populations."[6]

120.   According to the data collected on investigatory stops, "Black people were subjected to a search of their person 1.5 times more frequently than non-Black people, and also subjected to a pat-down 1.5 times more frequently than non-Black people."[7]

121.   Moreover, "Black people were also subjected to a vehicle search more often than non-Black people. Black motorists' vehicles were searched in 0.95% of traffic stops, which made searches of Black motorists' vehicles 3.3 times more frequent than searches of White motorists' vehicles (0.29% of traffic stops of White motorists) and 1.6 times more frequent than searches of all non-Black motorists' vehicles (0.60% of traffic stops of all non-Black motorists)."[8]

122.   A September 2022 OIG report identified "shortcomings related to the collection and management of litigation data involving CPD. These shortcomings limit the City's ability to understand areas of litigation risk to the City and to implement responsive improvements to CPD's operations and policies."[9]

123.   In an interview regarding the 2022 Report, Inspector General Deborah Witzburg acknowledged that the city was failing to improve CPD policy and practices stating,

> [w]e are paying out a lot of dollars without giving ourselves the opportunity to learn any lessons as a result. The city is not collecting the sort of information which would allow practices and policies to be

---

[6] *Ethnicity-Based Disparities in Chicago Police Department's Use of Force,* City of Chicago Office of Inspector General, (March 1, 2022), pp. 31-32, *available at* https://igchicago.orglwp-contentluploads/2022/02/Use-of.Force-Disparities-Report.pdf.
[7] Id.
[8] Id.
[9] *Use of Litigation Data in Risk Management Strategies for CPD,* City of Chicago Office of Inspector General, (September 29, 2022), available at https://tinyurl.com/yc5hd6n5.

improved[.] We should be learning lessons from settlements and judgments being paid out. Those are taxpayer dollars being paid out, either because there has been a finding that something went wrong or the city has made a determination to settle a claim that something went wrong. We are missing very expensive opportunities if we are not informing ourselves and improving practices and policies as a result of those settlements and judgments.[10]

124.    Underscoring Ms. Witzburg's comments, the City of Chicago recently approved (pending City Council authority) a $1.25 million settlement of a lawsuit stemming from the pretextual stop and subsequent shooting death of Dexter Reed in March 2024, which also resulted in the shooting injury of a police officer.

125.    Twenty-ninth ward Alderman Chris Taliaferro, Chair of the City Council's Police and Fire Committee, told the Chicago Sun-Times he believed the shooting was justified, but said that the seven-figure settlement was not unexpected "if the law department has concluded Reed should not have been stopped in the first place."[11]

126.    The Sun-Times article notes that "[a] monitor of the 5-year-old federal consent decree that calls for reforms in the police department recommended traffic stops be added to the list of police activities that should be reexamined, but that has yet to happen."[12]

127.    The City's indifference to its failure to achieve any significant progress in satisfying the requirements of the Consent Decree – and its corollary failure to reform itself in any meaningful way – are illustrated, in part, by the statements of those who were directly involved in the attempts to reform CPD.

---

[10] *Taxpayers shell out $250M in police-related settlements; new report slams city efforts to learn from those mistakes*, Chicago Sun Times, Fran Spielman, Sept 29, 2022, available at https://tinyurl.com/32da24yd.

[11] *Fatal police shooting of Dexter Reed leads to $1.25M settlement that includes reining in traffic stops,* Fran Spielman and Frank Main, Chicago Sun-Times, Feb. 3, 2025, accessible at https://tinyurl.com/v36xz3sh.

[12] Id.

128.     In 2021, Chad Williams, the former civilian commanding officer of CPD's audit division, resigned after emailing Mayor Lori Lightfoot to say that "my disappointment with the inability of this department's top leadership to even feign interest in pursuing reform in a meaningful manner has made it impossible for me to remain involved."[13]

129.     In August 2022, the City unceremoniously fired Robert Boik, CPD's executive director of constitutional policing and reform.  Arne Duncan, former U.S. Secretary of Education and founder of violence prevention organization Chicago CRED, wrote in a statement that "Bob Boik was fired for blowing the whistle and telling the truth — that he has no support and that the administration is not serious about police reform."[14]

130.     These facts evidence not only a deliberate indifference to the problems that resulted in the Consent Decree, but they also suggest an outright refusal to take any concrete steps toward reform, and an institutional hostility toward the idea of police reform.

131.     They also explain the City's remarkable failure – year after year – to achieve significant compliance with the provisions of the Consent Decree.

132.     The continued failure – as late as November 2024 – to make any significant progress on satisfying the requirements of the Consent Decree (as demonstrated by the foregoing findings of the IMT) is proof that the City's indifference remains to this date.

---

[13] *Chicago police director of reform fired following email to Superintendent David Brown over staff changes, sources say*, Annie Sweeney, Paige Fry and Gregory Royal Pratt, Chicago Tribune, accessible at https://tinyurl.com/558d5nkr.
[14] Id.

### *Wilkins* Lawsuit

133.     In a class action lawsuit filed against the City of Chicago last year by the American Civil Liberties Union, plaintiffs claim that traffic stops in Chicago skyrocketed after 2016 while stops throughout the rest of the state remained stable.[15]

134.     The *Wilkins* lawsuit is based in large part on data from the City's Office of Emergency Management and Communications (OEMC), and the Illinois Department of Transportation (IDOT).

135.     The *Wilkins* plaintiffs allege that "[s]ince 2016, CPD officers have targeted Black and Latino drivers with extremely high volumes of traffic stops, frisks, and searches, not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate community members (also called "pretextual" stops) on the basis of race and national origin (the "mass traffic stop program")."[16]

136.     The *Wilkins* plaintiffs allege further that CPD's pretextual traffic stops follow a typical pattern:

> CPD officers pull over a Black or Latino driver for an alleged minor traffic infraction... Regardless of whether the alleged infraction occurred, the actual purpose of these pretextual traffic stops is not to enforce traffic laws or write tickets (also called "citations"). Rather, CPD officers use the alleged minor traffic violation as an excuse to question and harass the driver about whether they have guns or drugs in the car. Often officers ask to search the car—or conduct a search without consent—and/or frisk the driver, looking for guns or drugs. Sometimes officers handcuff drivers while they search them and their vehicle. Most of the stops are pretextual because their real purpose is investigatory—to find guns, drugs, or other contraband. In over 99% of all stops, CPD officers do not find guns, drugs, or other contraband, in which case they typically let the driver go, without explanation or apology.[17]

---

[15] *Wilkins v. City of Chicago,* 23-cv-4072, Dkt. 87, ¶ 498.
[16] *Id.* at ¶ 2.
[17] *Id.* at ¶ 3.

137.    The above description from the *Wilkins* complaint is remarkably similar to what happened to Eddie on September 23, 2024. He was stopped for a minor parking infraction, his car was searched without his consent, the search revealed no guns, drugs or other contraband, and Eddie was released without explanation or apology.

138.    While most of the stops of the lead plaintiffs in *Wilkins* began with officers pulling over a moving vehicle, rather than officers approaching a stopped car, as they did in Eddie's case, there is no material difference between officer misconduct committed after they pull over a vehicle and officer misconduct committed after they approach a stopped vehicle. The indignity is the same. The misconduct is the same.

139.     According to the ACLU's study of IDOT data, CPD's traffic stops have ballooned in the last decade, from around 85,000 in 2015 to more than 535,000 stops in 2023.

140.    In 2023, CPD officers stopped Black drivers at a rate 3.75 times that of white drivers and stopped Latino drivers at a rate 2.73 times that of white drivers.

141.    CPD's traffic stops yield almost no public safety benefits. Less than one-half of one percent of traffic stops in 2023 resulted in officers finding any contraband (such as weapons or drugs) after they searched a driver's vehicle.

142.    In 2023, officers were more likely to find contraband in vehicles driven by white people, even though they were more likely to search cars driven by Black people.

## Racial Disparities in CPD Investigative Stops

143.     In 2023, approximately 35 percent of Chicagoans were white, 29 percent were Black, and 29 percent were Hispanic.

144.    Yet according to a study by the Illinois Department of Transportation – based on data submitted by the City of Chicago – 66 percent of pedestrians stopped by Chicago police officers in 2023 were Black, and 7.3 percent were white.

145.    The numbers are even more stark in the 18th District, where the incident in question occurred: While white residents make up 73 percent of the 18th district, they are only 11 percent of the pedestrians stopped by Chicago police officers in 2023. Seventy-two percent of pedestrians stopped in the 18th district were Black, despite the fact that Black people make up only 6.7 percent of the district's residents.[18]

146.    The numbers are similar when applied to the Defendant Officers in this case.

147.    According to ISR data from the Chicago Police Department, Defendant Fuentes was either the first officer or the second officer on 409 ISR stops between 2022 and 2024.

148.    Of those 409 stops, nearly 80 percent involved Black civilians, and only 6 percent involved white civilians.

149.    For the same period of time, Defendant Tohatan was involved as the first or second officer on 298 ISR stops.

150.    Of those 298 ISR stops, 254 – or 85 percent – involved Black civilians.

151.    For the same period of time, Defendant Vecchio was involved as the first or second officer on 280 ISR stops.

152.    Of those 280 ISR stops, 264 – nearly 95 percent – involved Black civilians.

153.    These stops occurred in a district that is 73 percent white and only 6.7 percent Black.

---

[18] On information and belief, pedestrian stop data includes all ISRs, which include officers approaching a stopped vehicle.

154. But the number of stops is likely far greater than we know. In August 2024, Injustice Watch, along with a non-profit organization called Bolts, determined that "Chicago Police officers have secretly pulled over as many as 20,000 more drivers per month in the past year than they have reported publicly, in violation of a 2003 law requiring them to document every traffic stop".[19]

155. The investigation revealed, among other things, that "police department officials know the traffic stop data they report to state regulators are an undercount."[20]

### COUNT I – FEDERAL CLAIM
### UNLAWFUL DETENTION
### DEFENDANT OFFICERS

156. Each paragraph of this Complaint is incorporated as if restated fully herein.

157. Defendants Officers caused Eddie to be detained without reasonable suspicion or probable cause to believe he had committed any crime or offense other than a minor parking infraction, in violation of the Fourth Amendment to the U.S. Constitution.

158. Alternatively, Defendant Officers detained Eddie for an unnecessary and unreasonable amount of time under the circumstances.

159. As a proximate result of Defendants' misconduct, Eddie suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

### COUNT II – FEDERAL CLAIM
### ILLEGAL SEARCH
### DEFENDANT VECCHIO

160. Each paragraph of this Complaint is incorporated as if restated fully herein.

---

[19] Sabino, Pascal, *Chicago police made nearly 200,000 secret traffic stops last year*, Injustice Watch. Available at https://tinyurl.com/yjudkw7k.
[20] Id.

161.     Vecchio searched Eddie's car without a warrant, without legal process, without his consent, and without probable cause or reasonable suspicion to believe the car contained evidence of a crime, in violation of the Fourth Amendment to the U.S. Constitution.

162.     As a proximate result of Defendants' misconduct, Eddie suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

**COUNT III – FEDERAL CLAIM**
**EXCESSIVE FORCE**
**DEFENDANT OFFICERS**

163.     Each paragraph of this Complaint is incorporated as if restated fully herein.

164.     There was no legal basis to order Eddie out of his car, to handcuff him, or to detain him. Therefore, the force used against Eddie by Defendant Officers, which included being handcuffed and being forcibly detained, was objectively unreasonable and unnecessary based on the totality of the circumstances, and was undertaken intentionally with malice, willfulness, and reckless indifference to Eddie's constitutional rights.

165.     As a proximate result of Defendant Officers' misconduct, Eddie suffered loss of liberty, physical pain and discomfort, fear, mental anguish, humiliation and emotional pain and suffering.

**COUNT IV**
**DENIAL OF EQUAL PROTECTION**
**DEFENDANT OFFICERS**

166.     Each paragraph of this Complaint is incorporated as if restated fully herein.

167.     As described more fully above, Defendant Officers denied Eddie equal protection of the law in violation of his constitutional rights.

168.     Defendant Officers targeted Eddie not because they had any lawful or legitimate basis to approach him, detain him, or search his property, but because he was Black.

169.    The misconduct described in this count was motivated by racial animus and constituted purposeful discrimination.

170.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

171.    The misconduct described above had a discriminatory effect and was motivated by a discriminatory purpose.

172.    As a proximate result of Defendant Officers' misconduct, Eddie suffered loss of liberty, physical pain and discomfort, fear, mental anguish, humiliation and emotional pain and suffering.

### COUNT V – FEDERAL CLAIM
### FAILURE TO INTERVENE
### DEFENDANT SENG

173.    Each paragraph of this Complaint is incorporated as if restated fully herein.

174.    As indicated herein, Defendant Seng not only participated in the unlawful conduct, but had the opportunity at any time to intervene to prevent further unconstitutional conduct by Vecchio but failed to do so.

175.    Seng was Vecchio's sergeant and direct supervisor.

176.    Moreover, as noted herein, Seng was personally aware of similar conduct by Vecchio less than a month earlier and failed to address it.

177.    As a proximate result of Defendant Seng's failure to intervene, Eddie suffered loss of liberty, physical pain and discomfort, fear, mental anguish, humiliation and emotional pain and suffering.

### COUNT VI – FEDERAL CLAIM
### POLICY AND PRACTICE
### CITY OF CHICAGO

178.    Each paragraph of this Complaint is incorporated as if restated fully herein.

179.     As a matter of both policy and practice, the actions and inactions of defendant City of Chicago and the Chicago Police Department have facilitated and permitted the very type of misconduct at issue here by supporting, promoting, and encouraging the policy of mass traffic stops that disproportionately target Black and Latino drivers, as well as illegal searches.

180.     Defendant City of Chicago and the Chicago Police Department failed to develop, maintain, and enforce proper procedures and conduct proper training of their employees, including but not limited to the Defendant Officers, and failed to control or discipline those employees on a continuing basis, said failures having proximately caused damages to Eddie.

181.     Defendant City of Chicago and the Chicago Police Department had the duty to properly instruct, supervise, control, discipline or otherwise prevent or aid in preventing the commission of said wrongs, and could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard towards Eddie and thousands of others, refused and/or failed to do so.

182.     As a proximate result of Defendant's misconduct, Eddie suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

### COUNT VII – STATE CLAIM
### FALSE ARREST/WRONGFUL IMPRISONMENT
### ALL DEFENDANTS

183.     Each paragraph of this Complaint is incorporated as if restated fully herein.

184.     Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Eddie without having reasonable grounds to believe he had committed any crime or offense.

185. Alternatively, Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Eddie for an unnecessary and unreasonable amount of time under the circumstances.

186. As a proximate result of Defendants' misconduct, Eddie suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT VIII – STATE CLAIM
### BATTERY
### ALL DEFENDANTS

187. Each paragraph of this Complaint is incorporated as if restated fully herein.

188. Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, made contact with Eddie of an insulting or provoking nature without his consent or legal justification, thereby committing a battery.

189. As a proximate result of Defendants' misconduct, Eddie suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

## COUNT IX – STATE CLAIM
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ALL DEFENDANTS

190. Each paragraph of this Complaint is incorporated as if restated fully herein.

191. Defendants' conduct, as described herein, was extreme and outrageous, defendants intended to cause or recklessly or consciously disregarded the probability of causing emotional distress, and Eddie suffered severe emotional distress as a proximate result of Defendants' actions.

192. As a proximate result of Defendants' misconduct, Eddie suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

## COUNT X – STATE CLAIM
### INDEMNIFICATION
### DEFENDANT CITY OF CHICAGO

193.   Each paragraph of this Complaint is incorporated as if restated fully herein.

194.   At all relevant times, CITY OF CHICAGO was the employer of Defendant Officers.

195.   Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the CITY OF CHICAGO.

196.   Illinois law provides that government entities are directed to pay any tort judgment for any damages for which employees are liable within the scope of their employment activities.

197.   Should Defendant Officers be found liable on one or more of the claims set forth above, Plaintiff EDDIE WILSON demands, pursuant to Illinois law, that their employer, Defendant CITY OF CHICAGO, be found liable for any judgment plaintiff obtains against Defendant Officers, as well as attorney's fees and costs awarded, and for any additional relief this Court deems just and proper.

## PRAYER FOR RELIEF (ALL COUNTS)

For the foregoing reasons, the Plaintiff EDDIE WILSON prays for judgment against Defendants in a fair and reasonable amount, including compensatory and punitive damages, attorney fees and costs, and for any additional relief this Court deems just and proper.

## JURY DEMAND

The Plaintiff EDDIE WILSON requests a trial by jury.

Respectfully submitted,
EDDIE WILSON

/s/ Jordan Marsh
*Attorney for the Plaintiff*

**LAW OFFICE OF JORDAN MARSH LLC**
5 Revere Drive Suite 200
Northbrook, IL 60062

26

(224) 220-9000
jordan@jmarshlaw.com